## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Securities and Exchange Commission,

        Plaintiff,

vs.

Biogenic, Inc., Diagnostic Link Ltd, LLC, Vital Systems Ltd LLC, BioTek Holdings LLC, Tek Wellness Inc., Capital Care Management LLC, Susann Ashley Cargnino a/k/a Susann Ashley Walker a/k/a Ashley Walker, Zachari Alan Cargnino a/k/a Zach Alan, Julie Ann Youssef a/k/a Julie Ann a/k/a Julie Joseph, and Gary Youssef a/k/a Gary Joseph,

        Defendants,

Case No. 5:21-cv-12236

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows against Defendants Biogenic, Inc., Diagnostic Link Ltd, LLC, BioTek Holdings LLC, Vital Systems Ltd LLC, Tek Wellness Inc., (collectively, "the Biogenic Entities"), Capital Care Management LLC ("Capital Care"), Susann Ashley Cargnino a/k/a Susann Ashley Walker a/k/a Ashley Walker ("Susann Cargnino"), Zachari Alan Cargnino a/k/a Zach Alan ("Zach Cargnino"), Julie Ann Youssef a/k/a Julie Ann a/k/a Julie Joseph ("Julie Youssef"), and Gary Youssef a/k/a Gary Joseph ("Gary Youssef"), (collectively, "Defendants"):

### I.    SUMMARY

1.    This is an illegal investment contracts case.  Beginning no later than June 2017, and continuing through at least March 2021, Defendants defrauded more than 55 investors out of nearly $7 million through sales of bogus investment contracts for a supposed "World-Class" and "Life Saving" medical device that "performs comprehensive neuropathic cardiovascular diagnostics."

2.      Working under the name of Vital Systems, Biogenic, or one of the other Biogenic Entities, Julie Youssef, Gary Youssef, Susan Cargnino, and Zach Cargnino directly or indirectly offered and sold to investors an investment contract involving a medical testing device that purportedly had been manufactured by one of the Biogenic Entities, which these individuals and the Biogenic Entities claimed would provide investors with $250 of "passive income" every time the device was used in a doctor's office. Defendants routinely communicated to prospective investors in writing and in conversations that the Biogenic Entity they were pitching at the time had more than 1,400 devices earning money for existing investors, with the devices being used on average more than five times each weekday and generating more than $10,000 per month in passive income for existing investors. These claims were false.

3.      Contrary to Defendants' claims, the devices behind the investment contract offerings were not manufactured by any of the Biogenic Entities but instead were purchased from a third party at a small fraction of the roughly $150,000 paid by defrauded investors. Also, contrary to Defendants' claims, fewer than 70 devices were ever purchased by Defendants, and doctors seldom used the devices before putting them in storage or asking Defendants to take them back. And to the extent any investor was informed that their device was being used by a doctor, the investor was provided phony usage reports and billing invoices fabricated by Julie Yousef or Zach Cargnino or others operating at their direction. These phony usage reports and billing invoices gave investors the misleading impression that the machines were regularly being used and the investors would make money on their investments from such use.

4.      Likewise, no investors appear to have ever received any money from the actual use of one of Defendants' devices much less anywhere close to the $10,000 per month described by Defendants in their offering communications. Rather, the purported "passive income" that investors received from their investment contracts came not from a doctor's use of a device but

rather from Ponzi payments that Zach Cargnino or Susan Cargnino sent using money received by one of the Biogenic Entities from new investors' purchases of investment contracts.  Indeed, at least one investor received purported "usage" revenue payments from Zach Cargnino out of money that the investor had himself paid to purchase additional investment contracts from Defendants.

5.      While all Defendants benefited from the fraud on investors, with each of the individuals receiving hundreds of thousands of dollars of illicit proceeds, Susann Cargnino and Zach Cargnino profited most from Defendants' scam.  Indeed, they used millions of dollars of defrauded investors' money to buy jewelry, jet skis and a trailer, pay for multiple vacation rentals and expensive home improvements, buy three residential properties in Manitou Beach, Michigan, and extinguish nearly $100,000 of pre-existing bankruptcy debt.

6.      Defendants' offers and sales of unregistered investment contract securities violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)].

7.      By directly or indirectly making materially false statements to investors to offer and sell investment contracts to investors, and/or engaging in deceptive acts in connection with the offer, purchase, and sale of these investment contracts, the Biogenic Entities, Capital Care, Julie Youssef, Gary Youssef and Zach Cargnino violated Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) thereunder [17 C.F.R. § 240.10b-5].

8.      As the principal or sole member and owner of the Biogenic Entities and, for a period of time, Capital Care, Susann Cargnino was at a minimum negligent with respect to the fraud committed by and through these companies, and is liable for violating Section 17(a)(3) of the Securities Act [15 U.S.C. §77q(a)(3)].  She also is jointly and severally liable as a control

person for the securities violations committed by and through these companies, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t].

9.　　As the principal or sole member and owner of Capital Care after acquiring ownership from his mother, and as the principal operational employee and Chief Financial Officer of each of the Biogenic Entities, Zach Cargnino is likewise jointly and severally liable as a control person for the securities violations committed by and through the Biogenic Entities and Capital Care, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t].

## II.　　JURISDICTION AND VENUE

10.　　This Court has jurisdiction pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78(e) and 78aa].

11.　　Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the means or instruments of transportation or communication in interstate commerce, in connection with the acts, practices, and courses of business set forth in this Complaint.

12.　　Venue lies in this Court pursuant to 15 U.S.C. §§ 77v(a) and 78aa, and 28 U.S.C. § 1391(b)(2).  Susann Cargnino and Zach Cagnino are both residents of Manitou Beach, Lenawee County, Michigan, which is within this judicial district.  Many illegal acts were perpetrated by these defendants within this judicial district and three Manitou Beach properties were purchased by Susann Cargnino and/or Zach Cagnino using illegally-obtained investor money.  Each of the Biogenic Entities are or were organized and/or registered in Michigan by Susann Cargnino and Zach Cagnino and ostensibly maintained offices within this judicial district.

### III.   DEFENDANTS

13.    **Biogenic Inc.** ("Biogenic") was incorporated in Michigan in February 2018, with Susann Cargnino as its sole member and owner and Zach Cargnino as its primary officer.  Its principal office was 8000 Yankee Rd., Ottawa Lake, Michigan.  Biogenic, through its agents and employees, solicited investors during the relevant period and received at least $5.4 million from 36 different investors.

14.    **Diagnostic Link LTD LLC** ("Diagnostic"), was incorporated in Michigan in August 2016 with Susann Cargnino as member and owner.  Zach Cargnino was Chief Financial Officer (CFO)/Treasurer and designated recipient of ten percent (10%) of the company's profits. Diagnostic's principal office was listed as 8000 Yankee Rd., Ottawa Lake, Michigan. Diagnostic was the predecessor to co-Defendant Vital Systems, which Susann Cargnino incorporated in November 2017.   Diagnostic received about $176,000 from four investors.

15.    **Vital Systems LTD LLC** ("Vital Systems"), was incorporated in Michigan in November 2017, with Susann Cargnino as its sole member and owner and Zach Cargnino as its primary officer.  Its principal office was 8000 Yankee Rd., Ottawa Lake, Michigan.  Vital Systems, the precursor business to Biogenic, Inc., through its agents and employees, solicited investors during the relevant period and received at least $1.5 million from seven investors.

16.    **Biotek Holdings LLC** ("Biotek") was incorporated in Michigan in October 2018, listing Susann Cargnino's pseudonym "Ashley Walker" – which are Susann Cargnino's middle name and maiden name – as its registered agent, President, Treasurer, Secretary, and Director. Zach Cargnino was Biotek's primary officer.  The operating address for Biotek is shown as 9194 Cherry Point Road, Manitou Beach, Michigan, an address otherwise used by Mrs. Cargnino, and Susan Cargnino was identified as Biotek's sole member and owner in communications with the IRS.  Biotek purported to offer the same diagnostic equipment, services, and investment

opportunity as Vital Systems and Biogenic and, along with co-Defendant Tek Wellness, received at least $759,000 from seven investors.

17.     **Tek Wellness, Inc.** ("Tek Wellness") was incorporated in Michigan in March 2019, listing Susann Cargnino's pseudonym "Ashley Walker" as its registered agent, President, Treasurer, Secretary, and Director.  Zach Cargnino was the primary officer for Tek Wellness. The operating address for Tek Wellness was 13854 Lakeside Circle, 22nd Floor #311, Sterling Heights, Michigan.  Tek Wellness purported to offer the same diagnostic equipment, services, and investment opportunity as Vital Systems and Biogenic and, along with co-Defendant Biotek, received at least $759,000 from seven investors.

18.     **Capital Care Management LLC** ("Capital Care") was created in August 2016 with Susann Cargnino as its sole member and owner, and a principal office at 8000 Yankee Rd., Ottawa Lake, Michigan.  Capital Care was registered in Florida in 2016 with a Capital Care employee listed as its agent, and remains an active business entity in that state.  The company was registered in Michigan in October 2017 listing "Zach Alan," the pseudonymous first and middle name of Defendant Zach Cargnino, as its authorized agent and CFO/Treasurer.

19.     **Susann Ashley Cargnino a/k/a Susann Ashley Walker a/k/a Ashley Walker** ("Susan Cargnino"), age 57, is a Michigan resident of Manitou Beach, Lenawee County, Michigan.  Susann Cargnino was the principal if not exclusive owner of all of the Biogenic Entities, and at one point the owner of Capital Care, and used defrauded investors' money to purchase three properties for herself and Zach Cargnino.  At various points in time, she used the names Susan Ashley Walker or Ashley Walker on documents related to the fraud to disguise her connection to her husband, Philip Cargnino, who was previously sentenced to 18 months in prison for an unrelated fraud.

20.     **Zachari Alan Cargnino a/k/a Zach Alan** ("Zach Cargnino"), age 32, is a resident of Manitou Beach, Michigan.  He was the CFO of all or most of the Biogenic Entities and he operated and controlled Capital Care.  Zach Cargnino admitted that he routinely used the pseudonym "Zach Alan" and intentionally omitted Cargnino, to avoid disclosure of Cargnino family involvement given prior public allegations against Zach Cargnino as well as his father's unrelated fraud conviction.  Among other activities, Zach Cargnino used Susann Cargnino's credit cards to register and set up websites for Capital Care and the Biogenic Entities with GoDaddy and/or other internet service providers, as well as email addresses for the companies and/or their employees through those providers, and at times changed the names associated with company and employee email accounts when public allegations of misconduct were made against one or more of the Defendants.

21.     **Gary Youssef a/k/a Gary Joseph** ("Gary Youssef"), age 71, is a resident of California and is married to Defendant Julie Youssef.  Gary Youssef purported to be the President of the Biogenic Entities.  Gary Youssef and his wife Defendant Julie Youssef are long-time friends and business associates of Susann and her husband, Phil Cargnino.  The Youssefs wrote a letter in support of Phil Cargnino at his 2012 sentencing for fraud.  Mr. Youssef personally made investment pitches to prospective investors over the telephone, by email, and in person, and routinely communicated false information about the company to investors as well as to medical sales representatives involved in the process.  Mr. Youssef and his wife collectively received at least $500,000 as part of the fraud.  Mr. Youssef asserted his right under the Fifth Amendment to the U.S. Constitution not to incriminate himself in response to most substantive questions from SEC staff during the SEC's investigation in this matter.

22.     **Julie Ann Youssef a/k/a Julie Ann a/k/a Julie Joseph** ("Julie Youssef"), age 53, is a resident of California and is married to Defendant Gary Youssef.  Julie Youssef purported to

be the Director of Business for the Biogenic Entities.  Mrs. Youssef personally made investment pitches to prospective investors over the telephone, by email, and in person, and routinely communicated false information about the company in the process.  In addition, Mrs. Youssef provided investors by email the Biogenic business plans and other investment contract offering documents that communicated false information about the company to investors.  Mrs. Youssef also communicated false information about the company over the phone and in electronic communications to medical sales representatives and doctors.  Mrs. Youssef and her husband collectively received at least $500,000 as part of the fraud.  Mrs. Youssef asserted her right under the Fifth Amendment to the U.S. Constitution not to incriminate herself in response to all substantive questions from SEC staff during the SEC's investigation in this matter.

## IV.   FACTS

**A.   DEFENDANTS PROVIDED MATERIALLY FALSE INFORMATION TO SCORES OF PROSPECTIVE INVESTORS AROUND THE UNITED STATES**

23.    Beginning no later than June 2017, Vital Systems and/or Biogenic (and, in fewer instances, one of the other Biogenic Entities) offered investment contract opportunities to hundreds of investors around the United States.

24.    No registration statement was ever filed with the Commission or in effect for any of these investment contract offerings and no exemption from registration applied.

25.    Gary Youssef, Julie Youssef, or one of the sales representatives they hired and had working at their direction, typically were the first and oftentimes the only contacts for prospective investors interested in the investment contract opportunity being offered by one of the Biogenic Entities.

26.    The Youssefs, and/or one of several sales representatives working in conjunction with them and at their direction, provided prospective investors with offering documents, by

email and in person, about the company and the diagnostic medical device at issue in the investment contract offering.  The Youssefs and their sales team also communicated with investors by text message and over the phone and repeated offering document information.

27.     Among other materials that the Youssefs and their sales team provided to prospective investors were business plans for one of the Biogenic Entities that were written by a combination of the Youssefs, Zach Cargnino, and other employees of Capital Care or one of the Biogenic Entities acting with their knowledge and at their direction.

28.     These business plans described the respective Biogenic entity as "a World-Class Medical Device Manufacturer" that "sells a *patented*, Life Saving Medical Device in the $3.4 Trillion Health Care Industry," with the device described as "a fully integrated, *non-invasive* medical testing system which performs comprehensive neuropathic cardiovascular diagnostics."

29.     The representations about the Biogenic Entities manufacturing the devices was important to investors as it caused them to believe they were dealing with a successful, sophisticated U.S. company capable of managing their investments and providing returns.

30.     The representations about the Biogenic Entities manufacturing the devices was materially false because none of the defendant entities manufactured any device much less the device described in the business plan.  Instead, Zach Cargnino, Capital Care, and/or one of the Biogenic Entities purchased the devices from the real manufacturer at a fraction of the price investors paid when they purchased their investment contract.  The Youssefs knew or were reckless in not knowing as much because at times they received devices directly from the true manufacturer when arranging installation at doctors' offices.

31.     The business plans for whichever of the Biogenic Entities was in effect at the time claimed the company "has a long history of success and currently we have 1,404 Diagnostic Partners' systems operating nationwide."  These statements were materially false because none of

the Biogenic Entities existed prior to August 2016 and the Biogenic Entities, collectively, never

purchased more than 70 devices much less had anywhere close to 1,404 Diagnostic Partners.

32.     The business plans offered investors the opportunity to become a "Diagnostic

Partner" with Vital Systems or Biogenic (or another Biogenic Entity) once they wired to the

company a "$150,000 Investment," [1] and ostensibly committed to a $225 monthly service fee.

33.     The business plans told investors they would not have to do anything as

Diagnostic Partners in order to profit from their investment:

> *Biogenic does everything for you.* We procure the clinic site and negotiate a Fee-
> for-Service (FFS) Agreement with the physicians on your behalf.  Biogenic
> programs your system with our proprietary software, delivers and installs
> computerized testing equipment and thoroughly trains the medical staff in the
> proper way to administer the tests. . . .  The test takes under 15 minutes and
> identifies the risk of sudden death, silent heart attack and much, much more.
> (Emphasis added).

34.     The business plans further explained the financial returns investors could expect

by becoming a Diagnostic Partner with Vital Systems, Biogenic, or another Biogenic Entity:

> The Biogenic system is *FDA Approved* and each time a test is performed, you will
> be paid a Fee of $250 (per the F-F-S) by the clinic.  The clinic is reimbursed an
> average of $500 per test by *Medicare, Medicaid and on average about 11% more
> per test from Private Insurers*. . . .  The Biogenic testing systems can be utilized
> up to ten or more times per day in some locations, and even at a substandard
> utilization rate of three tests per day, breakeven on a system purchase price of
> $150,000 is under 12 months.  Nationally, our Partners are [sic] average 5.1 tests
> per day in the summer and test 5.5 tests per day in the winter testing five days per
> week. (Emphasis in Original)

---

[1] In some instances, particularly when investors were purchasing more than one investment
contract, the purchase price went as low as $110,000.  In many instances, investors were offered
the opportunity to finance up to 50% of the purchase price through Capital Care after paying at
least $75,000 when purchasing the investment contract.  In fact, no financing was ever arranged
and this financing offer was merely a false inducement to receive partial payment from investors
who had less money to invest.

These statements were materially false because doctors were hardly if ever using the devices much less at a rate of five times per day or five days per week, and were not being reimbursed for the handful of times the devices were used much less at $500 or more per test.  The Youssefs, Zach Cargnino, and Capital Care were involved in placing devices in doctors' offices and communicated with doctors or their staff about actual usage and actual insurance reimbursement rates, and thus knew or were reckless in not knowing that actual usage and actual insurance reimbursement was materially lower than claimed in the business plans.

35.    While investors were offered the possibility of managing their own system and billing doctors directly, Defendants' business plans explained how investors could receive "'totally and purely passive' income" as a Diagnostic Partner if they signed on to have Biogenic provide "additional accounting services and support for the modest monthly fee of $225."[2]  The business plans explained the services and support the company would provide if investors signed on as Diagnostic Partners:

    i.  Establishing a separate checking account into which the system(s) revenues shall be deposited each month, copies of which shall be provided to the Diagnostic Partner

    ii.  Tracking the number of tests performed each month

    iii.  Billing the medical facility for the appropriate number of tests

    iv.  Collecting the amount payable by the medical facility under the FFS Agreement

    v.  Disabling the unit for failure to pay in a timely [manner], subject to agreed-upon cure periods

    vi.  If necessary, and on a best efforts basis, identifying new system locations

    vii.  Preparing a monthly Servicer Report setting forth data points such as:

        a.  Billings
        b.  Number of tests

---

[2] Zach Cargnino admitted in testimony during the SEC's investigation that at no point in time did Capital Care or any of the Biogenic Entities ever bill investors for the $225 service fee but nevertheless purported to offer and provide the accounting services and support.

     c.  Collections
     d.  Account reconciliations

All of the above activities (excepting v. above) can be performed by the Diagnostic Partner at their discretion, or Biogenic will perform these services for those who want "totally and purely passive" income.

36.     Virtually all of the investors who entered into investment contracts with Defendants agreed to be Diagnostic Partners and accept the proffered "accounting services and support," yet the offered services and support were entirely illusory.  Defendants never established separate checking accounts to collect revenues for any of the investors who signed on as Diagnostic Partners.  While investors were told that they would receive reports showing tests conducted by their machines, Julie Youssef, Zach Cargnino, and/or an employee working at her or his direction manufactured fake usage reports and doctor billing invoices.  Further, Zach Cargnino, or Susann Cargnino operating at his direction, made "revenue" payments to investors, if at all, out of a Capital Care bank account or one of the Biogenic Entities' bank accounts using money obtained from investors who were duped into purchasing investment contracts.

37.     Defendants' business plans repeated that the investment contract offered investors "a potentially large passive income for you":  "Some Diagnostic Partners initially have a preference to have their systems close to their place of residence.  As you will learn, that is certainly not necessary, as *this business is totally passive and requires no hands-on whatsoever as we remotely poll all systems*." (Emphasis added)

38.     The Youssefs, Zach Cargnino, and others working under their direction sent emails and text messages to prospective investors that routinely repeated many of the false claims reflected in the business plans and other offering documents, including that Biogenic entity manufactured the devices, had been in business for as much as 14 years, and had placed more than 1,400 diagnostic testing machines in doctors' offices.

39.     The Youssefs, Zach Cargnino, and/or others working under their direction also provided prospective investors with information about the company and the investment contract opportunity verbally over the telephone and in face-to-face meetings.  These communications typically regurgitated the false information contained in Defendants' business plans about the Biogenic Entities manufacturing the devices, how many devices had been put into use for investors, how often those devices were being used by doctors, and how much passive revenue those investors were receiving from such use.

40.     The Youssefs and Zach Cargnino knew or were reckless in not knowing that none of the entities had any history much less "a long history of success" because Zach Cargnino created new email addresses for the Youssefs and others working at his and their direction whenever a defendant entity was created, starting in 2016, and in many instances had their last names on the email changed to shield their true identity from investors in light of public allegations of misconduct and fraud.

41.     The Youssefs and Zach Cargnino also knew or were reckless in not knowing that the Biogenic entities did not even collectively have 1,404 Diagnostic Partners because they were involved in nearly all of the investment contract purchases related to the fewer than 70 devices that were ever actually purchased by Zach Cargnino, Capital Care, or one of the Biogenic Entities from the third-party manufacturer.

42.     The Youssefs and their sales team advertised the investment contract opportunity nationwide in the major print and electronic news media, on franchise recruitment websites, as well as on the find-businesses-for-sale website, BizBuySell.com.  These advertisements often described the investment contract as "a wonderful, Passive/Absentee offering for someone who wants to keep their current job or for a retired individual that desires to put their hard-earned retirement funds to

work."  The advertisements mimicked the materially false statements in the business plans, including that "Our 1,404 diagnostic partners are ALL Netting $10,000/mo or More!"

43.     The Youssefs and their team routinely put prospective investors in contact with at least three individuals who purported to be reaping the financial rewards of their relationship with the Biogenic Entities.  In fact, none of these individuals had ever paid for one of the devices, to the extent they even owned one at all, and none were receiving any revenue from the use of such devices.  Instead, at least one was a personal friend of the Youssefs and all were paid to lie to prospective investors and fabricate successful experiences with one of the Biogenic Entities.

44.     At several points during the relevant period, public allegations of misconduct and/or fraud were made against the Youssefs, Zach Cargnino, Capital Care, or one of the Biogenic Entities, including lawsuits filed in state court in Texas and California and public condemnations on the Ripoff Report website for reporting scams (www.ripoffreport.com).

45.     After such publicity, Zach Cargnino worked with an employee of Capital Care or one of the Biogenic Entities to change the name of the operative Biogenic entity and all associated email addresses, including changing offering documents and other company materials and email addresses to falsely identify Gary Youssef as "Gary Joseph," Julie Youssef as either "Julie Joseph" or "Julie Ann," Zach Cargnino as "Zach Alan," and also to use Susan Cargnino's "Susan Walker" or "Ashley Walker" pseudonyms on company filings and other public documents.

46.     In investigative testimony with the SEC, Susann Cargnino admitted that she was aware the Biogenic Entities that were offering the medical devices were changing names several times, all while using her aliases when she incorporated the later businesses.  Despite knowing this information, she neither sought nor received any explanation from Zach Cargnino as to why the changes were taking place.  Susann Cargnino also was the agent for service of process for at least

one investor lawsuit against one of the Biogenic Entities, but disclaimed in testimony any knowledge of the lawsuit.

47. As a result of Defendants' false communications and deceptive practices, at least 55 investors collectively paid roughly $6.8 million to purchase investment contracts from and engage as Diagnostic Partners with one or more of the Biogenic Entities.

48. Investor funds were initially deposited into the bank accounts of one of the Biogenic Entities that were controlled by Susann Cargnino. Zach Cargnino had direct online access to the accounts, including using Susann Cargnino's login information, and he made numerous electronic transfers and ACH payments out of the accounts. Susann Cargnino generally made deposits into and withdrawals from the accounts, including by obtaining cashiers' checks or directing wire transfers from the accounts. Zach Cargnino layered investor funds between multiple Biogenic Entity and CCM bank accounts to avoid detection.

49. From these company bank accounts Susann Cargnino or Zach Cargnino also made bank-to-bank transfer payments to the Youssefs, paying the Youssefs and their team collectively more than $2 million of illicit proceeds for their work in defrauding investors.

**B.    ZACH CARGNINO, CAPITAL CARE, AND JULIE YOUSSEF PROVIDED INVESTORS WITH PHONY USAGE REPORTS ALONG WITH "USAGE REVENUE" THAT WAS IN FACT MONEY FROM INVESTORS**

50. After investors purchased their investment contracts from one of the Biogenic Entities, Zach Cargnino and Capital Care arranged to purchase devices from the third-party manufacturer and directed a Capital Care employee to travel to doctors' offices around the United States to install the devices. Rarely if ever did these installations occur at locations near to the investor who had purchased the device, and investors often were instructed by the Youssefs and their sales team not to contact the doctors or their staff about the installation and use of the devices.

51.　　Defendants typically did not tell doctors about the investors.　Instead, documents provided to doctors indicated they were engaging with a "CONTRACTOR," which they typically believed to be Capital Care or the relevant Biogenic entity.　Doctors only learned about investors when they received calls from investors complaining that they were not receiving any payments.　Doctors have stated to the SEC during its investigation that if they had been told that investors were involved they would not have engaged with Capital Care or the Biogenic entity.

52.　　Doctors and their staff typically were provided little to no meaningful training by Capital Care and its employees on how to use the device or arrange for billing to Medicare, Medicaid, or private insurance when the device was used.　As result, doctors generally stopped trying to use the devices fairly quickly after receiving them and either asked to have them picked up by Capital Care or put the devices in storage or otherwise disposed of them.

53.　　To deceive investors about how often the devices were being used, Zach Cargnino created fake device usage reports and doctor billing invoices that reflected fictitious usage of investors' machines and fictitious collection of fees from doctors.　Zach Cargnino and Capital Care then emailed these phony documents directly to investors, or emailed the documents to Julie Youssef who then emailed them to investors herself or through one of her employees.

54.　　After directly or indirectly sending phony usage reports and doctor invoices to investors, Zach Cargnino and Capital Care used online banking systems to arrange payments to investors through bank-to-bank money transfers from defendant entity bank accounts that only he or Susann Cargnino could access or control.

55.　　Zach Cargnino and/or Julie Youssef, or others working at their direction, falsely communicated to investors by email, text, or in phone calls that these payments to investors were derived from device usage and payments from doctors, when they knew or were reckless in not

knowing that the money actually came from the proceeds of new investors' purchases of investment contracts.

56.     In total, Zach Cargnino sent about $537,000 of Ponzi payments to investors through ACH transfers from bank accounts belonging to Capital Care or one of the Biogenic Entities, making it appear as though the investors were receiving income from actual usage of the medical devices.  In addition, Zach Cargnino requested Susann Cargnino withdraw at least $124,000 in cashier's checks from bank accounts of one of the Biogenic Entities to pay four complaining investors as contractual "buyouts" which were funded out of money received from more recent investment contract investors.

57.     In investigative testimony with the SEC, Susann Cargnino testified that she knew about the medical device offerings to investors and acknowledged that she received and handled investor funds in bank accounts for the Biogenic Entities that she controlled.  She disclaimed understanding of the bank transactions she made, stating that she performed them at Zach Cargnino's request and direction despite being the person with responsibility for and authority over the company bank accounts.  As to the cashier check "buyouts" and other refunds, she admitted knowing they were being paid to investors.  She also testified that she neither sought nor received any explanation as to why the investors were complaining or demanding refunds.

58.     In order to induce the purchase of additional investment contracts, at least one investor, D.K., received what Zach Cargnino communicated to him was device usage revenue related to D.K.'s first few investment contracts.  In reality, in Ponzi-like fashion, Mr. Cargnino made payments to D.K. using money that D.K. previously had sent to purchase additional investment contracts from Defendants.  Zach Cargnino admitted in testimony during the SEC's investigation that no money had been received from any doctor in connection with these

payments to D.K. and, tellingly, could not provide a single explanation as to why he was making any payments to this investor.

**C.     SUSANN CARGNINO AND ZACH CARGNINO USED INVESTOR PROCEEDS TO PURCHASE RESIDENTIAL PROPERTIES AND LIVE LAVISHLY**

59.     In June 2018, Susann Cargnino used $675,000 of investor proceeds to purchase a residential property located at 9182 Cherry Point Road in Manitou Beach, Michigan.  She made the purchase in the name of 9182 Cherry Point Road LLC, a Michigan company that she or Zach Cargnino organized using her "Ashley Walker" pseudonym.  In June 2020, ownership of this property was re-titled into Zach Cargnino's name using a quitclaim deed, with Zach Cargnino signing on behalf of 9182 Cherry Point Road LLC in the paperwork process.  The property has a current estimated value of roughly $850,000.

60.     In August 2018, Susann Cargnino used $325,000 of investor proceeds to purchase a residential property located at 9194 Cherry Point Road in Manitou Beach, Michigan.  She made the purchase in the name of 9194 Cherry Point Road LLC, a Michigan company that she or Zach Cargnino organized using her "Ashley Walker" pseudonym.  On March 26, 2021, shortly after the SEC served investigative subpoenas on Defendants, the Cargninos listed the property for sale, and it sold on May 26, 2021, for $500,000.

61.     In March 2019, Susann Cargnino used $800,000 of investor proceeds to purchase a residential property located at 8962 Cherry Point Road in Manitou Beach, Michigan, which she titled in her name.  The property has a current estimated value of roughly $950,000.

62.     Susan Cargnino and/or Zach Cargnino used at least $175,000 of investor proceeds to buy two jet skis and a jet ski trailer, nearly $10,000 of jewelry, more than $8,000 of VRBO vacation rentals, more than $15,000 of home improvements, and spent nearly $100,000 to extinguish creditor claims from a prior bankruptcy.

## VI.    CLAIMS FOR RELIEF

### CLAIM ONE
### Violation of Section 5(a) and (c) of the Securities Act
### [15 U.S.C. § 77(a) and (c)]
### (Against All Defendants)

63.     Paragraphs 1 through 62 are re-alleged and incorporated by reference

64.     Section 5(a) of the Securities Act provides that unless a registration statement is in effect as to a security, it shall be unlawful any person, directly or directly, (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

65.     Section 5(c) of the Securities Act provides that it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

66.     No registration statement had been filed or was in effect for any of the investment contract securities offered and sold by Defendants and no exemption applied.

67.     Defendants, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to sell such investment contract securities.

68.     By reason of the foregoing, Defendants violated, and unless enjoined will again violate, Section 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

**CLAIM TWO**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Against the Biogenic Entities, Capital Care, Julie Youssef, Gary Youssef, Zach Cargnino)**

69.     Paragraphs 1 through 62 are re-alleged and incorporated by reference.

70.     Section 10(b) of the Exchange Act provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

71.     Rule 10b-5 provide that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

72.     By reason of the foregoing, the Biogenic Entities, Capital Care, Julie Youssef, Gary Youssef, and Zach Cargnino violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**CLAIM THREE**
**Violations of Section 17(a) of the Securities Act**
**[15 U.S.C. § 77q(a)]**
**(Against the Biogenic Entities, Capital Care, Julie Youssef, Gary Youssef, Zach Cargnino)**

73.     Paragraphs 1 through 62 are re-alleged and incorporated by reference.

74.     Section 17(a) of the Securities Act provides that it shall be unlawful for any person in the offer in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, directly or indirectly (1) to employ any device, scheme or artifice to defraud, (2) to obtain money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, or (3) to engage in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

75.     By reason of the foregoing, the Biogenic Entities, Capital Care, Julie Youssef, Gary Youssef, and Zach Cargnino violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**CLAIM FOUR**
**Violations of Section 17(a)(3) of the Securities Act**
**[15 U.S.C. § 77q(a)]**
**(Against Susann Cargnino)**

76.     Paragraphs 1 through 62 are re-alleged and incorporated by reference.

77.     Section 17(a)(3) of the Securities Act provides that it shall be unlawful for any person in the offer in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, directly or indirectly, to engage in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

78.     By reason of the foregoing, Susann Cargnino violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**CLAIM FIVE**
**Control Person Liability Under Section 20(a) of the Exchange Act**
**[15 U.S.C. § 78t(a)]**
**(Against Susann Cargnino and Zach Cargnino)**

79.     Paragraphs 1 through 62 are re-alleged and incorporated by reference.

80.     Section 20(a) of the Exchange Act provides that every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

81.     As alleged above, Susan Cargnino and Zach Cargnino were the only principals, owners, and officers of each of the Biogenic Entities and Capital Care and at no point in time acted in good faith.

82.     As alleged above, the Biogenic Entities and Capital Care violated Sections 5(a), (c), and 17(a) of the Securities Act [15 U.S.C. § 77(a) and (c), 15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

83.     Accordingly, Susann Cargnino and Zach Cargnino are liable as a controlling person for the securities violations committed by the Biogenic Entities and Capital Care pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

## VII.    PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

1.      Finding that Defendants committed the securities law violations alleged in this Complaint;

2.      Permanently enjoining Defendants from violating, directly or indirectly, Sections 5 (a), (c), and 17 of the Securities Act [15 U.S.C. §§ 77(a) and (c), 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

3.      Permanently enjoining Defendants from directly or indirectly, including, but not limited to, through any entity owned or controlled by Defendants, participating in the issuance, purchase, offer, or sale of any security in an unregistered transaction, including but not limited to investment contracts or other securities related to medical testing devices or medical equipment; provided, however, that such injunction shall not prevent Defendants from purchasing or selling securities listed on a national securities exchange for his/her/its own personal account;

4.      Ordering that each of the Defendants disgorge any and all ill-gotten gains, together with pre-judgment and post-judgment interest, derived from the securities law violations set forth in this Complaint;

5.      Imposing civil monetary penalties against Defendants for each of their securities law violations, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

6.      Retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

7.      Granting such other relief as this Court may deem just or appropriate.

## VIII.   JURY DEMAND

The SEC demands a jury in this matter.

Dated:  September 23, 2021

Respectfully submitted,

*s/ Christian D. H. Schultz*
Christian D. H. Schultz
    Assistant Chief Litigation Counsel
Timothy England
    Assistant Director
Stephen Kaiser
    Senior Counsel
Matthew Reisig
    Senior Counsel
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-4740 (Schultz)
schultzc@sec.gov